# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

LUPE ZAMORA,                                    ) NO. EDCV 17-0502-KS
           **Plaintiff,**                          )
   **v.**                                    ) **MEMORANDUM OPINION AND ORDER**
                                  )
NANCY A. BERRYHILL, Acting                      )
Commissioner of Social Security,                )
           **Defendant.**                          )
_____               )

## INTRODUCTION

Lupe Zamora ("Plaintiff") filed a Complaint on March 17, 2017, seeking review of the denial of her application for Supplemental Security Income ("SSI"). (Dkt. No. 1.) On April 25, 2017, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 12, 14, 15.) On November 13, 2017, the parties filed a Joint Stipulation ("Joint Stip."). (Dkt. No 23.) Plaintiff seeks an order reversing the Commissioner's decision and remanding for further proceedings. (Joint Stip. at 22.) The Commissioner requests that the ALJ's decision be affirmed. (Joint Stip. at 22.) The Court has taken the matter under submission without oral argument and remands the case for further proceedings.

1

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On November 28, 2012, Plaintiff, who was born on May 26, 1964, protectively filed an application for SSI under Title XVI.[1] (Administrative Record ("AR") 60-72.) Plaintiff alleged disability beginning January 1, 2008 due to arthritis, thyroid, asthma, learning disability, seizures, emotional, high blood pressure, and depression. (AR 86.) The Commissioner denied Plaintiff's application initially on August 8, 2013 and upon reconsideration on January 30, 2014. (AR 29, 35-38.) Plaintiff then requested a hearing. (AR 42). Administrative Law Judge Troy Silva ("ALJ") held a hearing on April 9, 2015. (AR 398-425.) Plaintiff, represented by counsel, testified before the ALJ as did vocational expert ("VE") Sandra Fioretti. (*Id.*) On May 29, 2015, the ALJ issued an unfavorable decision, denying Plaintiff's application for benefits. (AR 12-27.) On January 17, 2017, the Appeals Council denied Plaintiff's request for review. (AR 4-7.) Plaintiff timely filed this Complaint.

## SUMMARY OF ADMINISTRATIVE DECISION

Applying the five step sequential disability evaluation process, at Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the day she filed her application for benefits on November 28, 2012 through the date of his decision. (AR 17.) At Step Two, the ALJ found that Plaintiff had the following severe impairments:

> "bipolar disorder, depressed, with psychosis; patellofemoral syndrome involving the bilateral knees; morbid obesity; status post Baxter's nerve release, and status post plantar fascia release of the left heel"

---

[1]  Plaintiff was 48 years old on the application date and thus met the agency's definition of a "younger individual." *See* 20 C.F.R. § 416.963(c).

(AR 17.)  At Step Three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairments listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926).  (AR 17.)  The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work with the following limitations:

> "[Plaintiff] can lift and carry 50 pounds occasionally and 25 pounds frequently. She can stand and walk for six hours out of an eight-hour workday, and she can sit for six hours out of an eight-hour workday.  She can frequently walk over uneven terrain, climb ladders, and work at heights.  She can frequently bend, crouch, stoop, and crawl.  She is limited to simple, repetitive tasks."

(AR 19.)

At Step Four, the ALJ found that Plaintiff had no past relevant work.  (AR 26.) Finally, at Step Five, the ALJ considered Plaintiff's RFC and relying on the testimony of the VE found that Plaintiff could perform jobs existing in significant numbers in the national economy, such as industrial cleaner (DOT[2] 381.687-018), hand packager (DOT 920.587-018), and kitchen helper (DOT 318.687-010).  (AR 27.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the application filing date through the date of the ALJ's decision.  (*Id.*)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the

---

[2]  "DOT" refers to the *Dictionary of Occupational Titles*.

3

record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review "the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (citations omitted); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations omitted).

The Court will uphold the Commissioner's decision when "the evidence is susceptible to more than one rational interpretation." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not reverse the Commissioner's decision if it is based on harmless error, meaning error that is "inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (citations omitted).

//
//
//

4

**DISCUSSION**

The parties raise two issues.  The first is whether the ALJ 's determination of Plaintiff's RFC properly considered the physical and mental medical evidence of record. (Joint Stip. at 2.)  The second is whether the ALJ properly determined Plaintiff's credibility regarding her subjective statements about her symptoms and their limiting effects.  (Joint Stip. at 2.)  The Court finds that both issues, as they relate to Plaintiff's mental health only, warrant reversal.

**I.     The ALJ Erred In Determining Plaintiff's Psychological RFC**

Plaintiff argues that the ALJ's RFC determination failed to properly consider the medical evidence of her physical impairments, improperly relied on a discredited orthopedic consultative examiner, failed to give proper weight to a treating psychiatrist, and failed to develop the record concerning her mental impairments.  (Joint Stip. at 3-6.)

A. **Facts**

1. **Physical medical history**

On August 14, 2014, Plaintiff measured 5 feet 6 inches tall and weighed approximately 283 pounds.  (AR 197.)  Imaging of Plaintiff' knees from August 2012 shows Plaintiff has bilateral osteoarthritis.  (AR 266.)  In February 2013, Plaintiff reported that walking upstairs caused her pain and her knees collapsed randomly when she walked.  (AR 340.)  An x-ray of Plaintiff's right foot from June 2013 showed calcaneal spurs, vascular calcification, and soft tissue swelling.  (AR 337.)  An MRI of her left ankle from October 2013 showed degenerative changes and a probable lipoma along the lateral malleolus.  (AR 156.)  Imaging of Plaintiff's left calcaneus in July 2014 showed posterior and plantar

enthesophytes and mild degenerative changes, but no acute abnormalities. (AR 303.) X-rays of Plaintiff hands on January 23, 2015 were considered unremarkable but showed osteophytosis or periarticular erosion and small accessory ossicles. (AR 274.)

### a. Plaintiff's doctors' treatment notes

Doctor Nguyen-Phuong Pham appears to have started treating Plaintiff around July 2012. (AR 249-253.) Dr. Pham was her primary care physician at least through early 2015 and treated her or referred her for a number of issues including knee pain, ankle pain, calcaneal spurs, elbow pain, hypertension, hypothyroidism, headaches, insomnia, and psychological issues including depression and bipolar disorder. (AR 189-270).

Plaintiff underwent surgery on her left foot for plantar fasciitis on January 15, 2015. (AR 278.) Doctor David Shofler performed the surgery. (AR 278.) On January 23, 2015, eight days after the surgery, Plaintiff walked to the doctor's office for a postoperative visit where she complained of persistent pain that was not controlled by her pain medication. (AR 275.) Plaintiff had changed the bandage on her foot despite instructions to leave the original bandage in place. (AR 275.) Plaintiff also needed to walk home after the visit but was advised to walk on it as little as possible until her next appointment in two weeks. (AR 275.) Plaintiff had x-rays of her hands taken on the same day at the same medical center. (AR 274.) Plaintiff returned for her second postoperative appointment one week later, which was one week early. (AR 273.) She walked to this visit as well, admitted to walking a lot, and to walking mostly without the protective boot. (AR 273.) Her new pain prescription had not been filled yet, so the doctor contacted the pharmacy again. (AR 273.) One week later, she returned to have her sutures removed. (AR 272.) The skin around the incision was healing well and the doctor attributed the persistent pain to Plaintiff's walking a lot after the surgery. (AR 272.) Dr. Shofler noted Plaintiff was noncompliant with postoperative protocol but did say her frequent walking post-surgery was a result of her personal circumstances. (AR 272.)

### b. Doctor Bernabe's Medical Opinion

Doctor Vicente R. Bernabe, a board certified orthopedic surgeon, examined Plaintiff on June 11, 2013 at the request of the Department of Social Services. (AR 136-40.) Plaintiff informed Dr. Bernabe she was experiencing pain in her knees and legs with sharp pain in her knees and ankles aggravated by extended periods of standing and walking. (AR 136.) She also told Dr. Bernabe she was currently only being treated with physical therapy and pain medication. (AR 136.) Dr. Bernabe did not have any of Plaintiff's medical records for review and he did not take any x-rays. (AR 136, 139.) Dr. Bernabe noted Plaintiff had a history of arthritis and her family had a history of arthritis and bone/joint problems. (AR 137.) Plaintiff was five feet six inches tall and weighed 280 pounds. (AR 137.) Dr. Bernabe saw Plaintiff was able to move around without difficulty or pain and did not use any devices to help her walk. (AR 137.) Plaintiff's station and gait, cervical spine, thoracic spine, and lumbar spine were all normal and straight leg raise tests in the seated and supine positions were negative for both legs. (AR 137-38.) Dr. Bernabe found no problems in Plaintiff's shoulders, elbows, wrists, or hands. (AR 138.) Plaintiff also had full range of motion in her hips, ankles, and feet without experiencing pain. (AR 138.) Dr. Bernabe did observe patellofemoral grinding and crepitus in both of Plaintiff's knees and her range of motion was 0 to 130 degrees, but her knees had normal alignment and contour, the ligaments were stable, and they were not tender when touched. (AR 138.)

Dr. Bernabe's medical opinion was that Plaintiff was morbidly obese and had patellofemoral pain syndrome in both knees. (AR 139.) It was his medical opinion that Plaintiff could nonetheless lift and carry 50 pounds occasionally and 25 pounds frequently. (AR 139.) He also opined Plaintiff could walk and stand for six hours out of an eight-hour work day, sit for six hours out of an eight-hour work day, frequently push and pull, frequently walk on uneven terrain, climb ladders, and work at heights, and frequently bend, crouch,

stoop, and crawl.  (AR 139-40.)  He found Plaintiff did not need an assistive device when walking and that she had no limitations related to her hands.  (AR 140.)

### 2. Psychological medical history

Plaintiff went to the Emergency Room on April 24, 2012 because she was depressed and claimed she had been crying "all the time" for two weeks.  (AR 355.)  She denied having hallucinations or suicidal thoughts.  (AR 355-56.)  On September 18, 2013, Plaintiff received emergency treatment for a possible drug overdose.  (AR 161-63.)  She stated she had taken medication to help her sleep because she had been having trouble sleeping for a few days.  (AR 172.)  Plaintiff denied having ever attempted to commit suicide, denied having hallucinations, and she was not admitted on an involuntary psychiatric hold.  (AR 161, 170-72.)  A few weeks prior to this, on August 29, 2013, Doctor Denise Dittenmore began treating Plaintiff for mental health.  (AR 150-51.)  Plaintiff reported to Dr. Dittenmore that she experienced visual hallucinations.  (AR 150.)  Dr. Dittenmore diagnosed Plaintiff with bipolar disorder and depression with psychosis.  (AR 151, 153.)  Plaintiff's treatment, or at least prescription of medication, appears to have been largely consistent with Dr. Dittenmore from August 2013 through February 2015.  (AR 184-86.)

### a. Doctor Dittenmore's Medical Opinion

Dr. Dittenmore completed a Mental Residual Functional Capacity Statement for Plaintiff.  (AR 394-97.)  It was submitted as additional evidence to the Appeals Council after the ALJ's decision.  (AR 8.)  Dr. Dittenmore again diagnosed Plaintiff with bipolar disorder and depression with psychosis.  (AR 394.)  Dr. Dittenmore rated Plaintiff as being precluded from performance for 15% or more of an 8-hour work day in understanding and memory. (AR 395.)  Dr. Dittenmore rated Plaintiff as being precluded from performance for 15% or more of an 8-hour work day in sustained concentration and memory except she was not

precluded from making simple work-related decisions.  (AR 395.)  For social interactions, Dr. Dittenmore found Plaintiff was not precluded from asking simple questions and requesting assistance or from maintaining socially appropriate behavior and adhering to basic neatness and cleanliness standards.  (AR 395-96.)  Plaintiff was 5% precluded from interacting appropriately with the general public.  (AR 395.)  Plaintiff was precluded from performance for 15% or more of an 8-hour work day in accepting instructions and responding appropriately to criticism from supervisors and in getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (AR 395.)  In regards to adaptation, Dr. Dittenmore listed Plaintiff as being precluded from performance during an 8-hour work day 5% of the time relating to being aware of normal hazards and taking appropriate precautions, 10% of the time for setting realistic goals or making plans independently of others, and 15% or more of the time for responding appropriately to changes in the work setting and traveling in unfamiliar places or using public transportation.  (AR 396.)  Dr. Dittenmore wrote in relation to this last point that Plaintiff needed to travel with her boyfriend.  (AR 396.)

Dr. Dittenmore further found that Plaintiff would be off task more than 30% of the time, would miss more than 6 days of work per month, and would be unable to complete an 8-hour work day more than 6 days per month.  (AR 396.)  Dr. Dittenmore stated Plaintiff did not have reduced intellectual functioning but that she was in special education from 4th to 12th grade.  (AR 397.)  Finally, Dr. Dittenmore wrote that Plaintiff has "severe mood swings" and "anger outbursts" and that she is "essentially illiterate, can't spell, read, or solve math problems."  (AR 397.)

### b.  Doctor Chehrazi's Medical Opinion

Doctor Avazeh Chehrazi also provided a psychological evaluation of Plaintiff at the request of the Department of Social Services.  (AR 141-45.)  The evaluation took place on

June 1, 2013. (AR 141.) Plaintiff's medications at the time included Elavil, Lioresal, Norco, Zoloft, Synthroid, and Vasotec. (AR 142.) Plaintiff denied any psychiatric hospitalizations or suicidal ideations. (AR 142.) Plaintiff denied seeing or hearing hallucinations and no "bizarreness or confusion was present." (AR 143.) Plaintiff stated she graduated from high school but was in special education from first through twelfth grade. (AR 142.) She reported being able to dress, bathe, make simple meals, and pay bills without help but stated she did need help shopping, doing laundry, and doing household chores because of pain. (AR 143.) She also reported relying on others to drive her places because she does not have a driver's license. (AR 143.)

Plaintiff's behavior during the evaluation appears to have been normal. (AR 143.) Her mood was sad and her affect dysphoric. (AR 143.) Her intellectual functioning was mildly delayed. (AR 143.) Plaintiff's immediate and recent memories were weak evidenced by her ability to repeat five digits forward but only two backward and recall only two out of three objects after a five minute period with an intentional distraction. (AR 143.) Her fund of knowledge was poor as she knew who the current president was and how many days are in a week, but incorrectly answered how many items make a dozen. (AR 143.) Her attention and concentration were adequate throughout the interview and testing. (AR 143.) Her judgment for common sense hypotheticals was also adequate as she knew why cars have seat belts and what she would do if she found someone's wallet in a store. (AR 143-44.) Weschsler tests showed Plaintiff's general intellectual functioning as mildly delayed and her general memory function as borderline to mildly delayed. (AR 144.)

Dr. Chehrazi found Plaintiff's overall cognitive ability was mildly delayed and listed her probable diagnoses as dysthymic disorder, mild intellectual disability, and economic psychosocial stressors. (AR 144.) It was Dr. Chehrazi's medical opinion that Plaintiff would have no difficulty with following simple instructions but would have moderate difficulty with detailed and complex instructions. (AR 145.) Dr. Chehrazi further opined

that Plaintiff would have no difficulty making simple work-related decisions or responding to changes in a work environment. (AR 145.) Dr. Chehrazi found Plaintiff would have mild difficulty complying with safety and attendance job rules as well as maintaining normal work persistence and pace. (AR 145.) Although Dr. Chehrazi thought Plaintiff was socially appropriate during the appointment, Dr. Chehrazi stated Plaintiff would have mild difficulty consistently interacting socially with people at work in an appropriate manner. (AR 145.) Dr. Chehrazi also stated Plaintiff appeared capable of managing her own finances but Plaintiff did report that her boyfriend managed their finances. (AR 143-145.)

### 3. The ALJ's RFC Determination

The ALJ noted that Plaintiff alleged she was disabled due to "arthritis, thyroid disease, asthma, a learning disability, seizures, emotional problems, hypertension, and depression." (AR 20.) The ALJ then discussed Plaintiff's medical records in detail. (AR 20-26.) The ALJ found Plaintiff's physical pain was either transitory in nature or controlled with pain medication evidenced primarily by her comments to Dr. Pham in the treatment records. (AR 20-26.) The ALJ discussed Plaintiff's foot pain, surgery, post-surgery pain and walking despite instructions to rest, and noted her surgical wound had healed well. (AR 22.) He considered Dr. Bernabe's medical opinion and found it was largely consistent with the examination and medical records, although he stated a light exertional capacity for Plaintiff would be more appropriate than Dr. Bernabe's opined medium exertional capacity. (AR 20-21.) The ALJ found Plaintiff's hypothyroidism and hypertension were largely controlled when Plaintiff took medication for them. (AR 20, 23.) The ALJ addressed additional medical issues, like Plaintiff's headaches and hand pain, finding they were transitory and only affected her minimally. (AR 22.) The ALJ dismissed Plaintiff's complaints of asthma and seizures because there was no evidence of treatment for either condition. (AR 23.) The ALJ stated he considered her weight when determining Plaintiff's RFC. (AR 23.)

Next, the ALJ considered Plaintiff's psychological impairments. (AR 23-26.) The ALJ delineated Plaintiff's first trip to the emergency room, being prescribed different depression medications, and being diagnosed with bipolar disorder. (AR 23.) The ALJ next discussed Dr. Chehrazi's observations and opinions and then adopted them. (AR 23-24.) The ALJ found Plaintiff had been in special education classes but had graduated high school and that nothing in the record showed Plaintiff had low intellectual functioning prior to age 22. (AR 24.) The ALJ also stated that the record showed Plaintiff understands treatment plans and is capable of communicating her needs. (AR 24.) Next, the ALJ mentioned Plaintiff's meeting with a psychiatrist (Dr. Dittenmore) on August 29, 2013 where she alleged to have visual hallucinations. (AR 24.) The ALJ commented Plaintiff went to the emergency room for a suspected drug overdose but was released to go home because she was not believed to be a danger to herself or others. (AR 25.) Then the ALJ listed times where Plaintiff had varying levels of depression despite sometimes being out of her medication. (AR 25.) The ALJ stated that at the hearing, Plaintiff said she was not receiving mental health treatment but her medication was helping. (AR 25.) The ALJ also found that despite instances of claiming to have hallucinations, there was "no evidence the claimant responds to internal stimuli." (AR 25.) The medical opinions of the Stage Agency doctors also suggested Plaintiff could perform simple work tasks in a non-public environment. (AR 26.)

The ALJ found there was substantial evidence that showed Plaintiff could still perform work activities. Plaintiff's daily activities included washing dishes, making simple meals, dressing herself, bathing herself, going for a walk, watching television, doing puzzles, and spending time with family and friends. (AR 25.) Plaintiff was in special education but graduated from high school and only received a few D grades and she stated she can read and write simple words. (AR 25.) Plaintiff walked to her podiatry appointment shortly after surgery, there was no evidence of complications since the surgery, and the rest of Plaintiff's treatment had been conservative. (AR 25.) Accordingly, the ALJ found Plaintiff could perform medium work with limitations mentioned previously. (AR 19, 25-27.)

At the ALJ hearing, the ALJ posed a hypothetical to the VE that included an almost identical RFC (medium work with certain limitations) that he later included in his decision. (AR 19, 420-21.)  Based on the VE's testimony, the ALJ determined that despite Plaintiff's limitations, there were jobs in significant numbers in the national economy Plaintiff could perform and she was not disabled.  (AR 26-27.)

B.  **Applicable Law**

A claimant's RFC represents the most a claimant can do despite his or her limitations. 20 C.F.R. § 416.945 (a)(1); *Reddick v. Chater*, 157 F.3d 715, 724 (9th Cir. 1998).  An ALJ's RFC determination "must set out *all* the limitations and restrictions of the particular claimant."  *Valentine v. Comm'r SSA*, 574 F.3d 685, 690 (9th Cir. 2009) (emphasis in original) (citation omitted).  In particular, the RFC determination must account for the opinion of a claimant's treating physician unless that opinion is properly rejected.  *See Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1164 (9th Cir. 2008).

There are three categories of physicians: treating physicians, examining physicians, and nonexamining physicians.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); *see* 20 C.F.R. 416.927.[3]  Treating physician opinions should be given more weight than examining or nonexamining physician opinions.  *Orn*, 495 F.3d at 632.  If the treating physician's opinion is not contradicted by another doctor, it may be rejected only if the ALJ provides "clear and convincing reasons supported by substantial evidence in the record."  *Id.*  If the treating physician's opinion is contradicted by another doctor, it may be rejected only by "specific and legitimate reasons supported by substantial evidence in the record."  *Id.*

---

[3]    Effective March 27, 2017, the Social Security Administration revised its regulations directing the evaluation of medical opinion evidence, including 20 C.F.R §§ 404.1527, 416.927. But these revisions are not applicable or relevant to the analysis here relating to Plaintiff's November 28, 2012 application for SSI benefits.

Examining physician opinions too are given more weight than nonexamining physician opinions. *Lester*, 81 F.3d at 830. If the examining physician's opinion is not contradicted by another doctor, it too may be rejected only if the ALJ provides clear and convincing reasons supported by substantial evidence in the record. *Id.* If the examining physician's opinion is contradicted by another doctor, it may be rejected only if there are specific and legitimate reasons supported by substantial evidence in the record. *Id.* at 830-31. An ALJ can satisfy the substantial and legitimate reasons standard by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretations thereof, and making findings." *Orn*, 495 F.3d at 632.

An ALJ also has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered, even when the claimant is represented by counsel. *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (citation omitted). Although the burden to establish disability lies with the claimant, "it is equally clear that the ALJ has a duty to assist in developing the record." *Reed v. Massanari*, 270 F.3d 838, 841 (9th Cir. 2001) (citations omitted). The ALJ's duty to develop the record is triggered "when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-460 (9th Cir. 2001) (citation omitted). The Social Security Administration ("SSA") will attempt to get medical evidence from a claimant's medical sources if given permission and may request and provide for a consultative examination if necessary. *See* 20 C.F.R. § 416.912.

C. **Analysis**

1. **Physical impairments**

Plaintiff relies on three sources of evidence in her argument to show the ALJ erred in his RFC determination related to her physical impairments. First, Plaintiff cites many of her

physical impairments, primarily related to her lower extremities and morbid obesity, to show the ALJ failed to properly consider her physical medical evidence in determining her RFC. (Joint Stip. at 3-4.) Second, Plaintiff identifies an inconsistency in the ALJ's opinion relating to the level of exertional capacity that he found Plaintiff can perform. (Joint Stip. at 4.) Third, Plaintiff criticizes the opinion of the orthopedic consultative examiner and argues any reliance by the ALJ on the consultative examiner's opinion was error because the SSA has since fired the doctor as a consultative examiner. (Joint Stip. at 4-5.) Defendant argues the ALJ considered and discussed in detail the entire medical record, any inconsistency in the exertional level was a harmless typographical error, and substantial evidence in the record supports the ALJ's conclusion. (Joint Stip. at 7-12.)

Although Plaintiff argues that in reaching his RFC determination, the ALJ did not fully consider the objective medical evidence concerning her lower extremities and morbid obesity, the ALJ's opinion shows he reviewed all of her medical records. Specifically, Plaintiff claims the RFC is wrong because she cannot perform medium work, cannot stand and/or walk for six hours out of an eight-hour work day, and cannot climb ladders frequently. (Joint Stip. at 3.) The ALJ considered the objective medical evidence, but found the record showed Plaintiff's impairments did not prevent her from performing these work-related activities. The record showed her symptoms were largely controlled with medication and conservative treatment or no treatment. Further, the fact Plaintiff walked to two of her post-surgical podiatry appointments showed she was capable of walking farther than she claimed.

While there was no medical opinion from any of Plaintiff's treating physicians for her physical conditions, there was a consultative medical examiner's opinion. An examining physician's opinion that is uncontradicted may only be rejected by the ALJ if there are clear and convincing reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. Dr. Bernabe's opinion appears to be uncontradicted as there is no other medical

15

opinion concerning Plaintiff's physical impairments in the record. As the ALJ did not find clear and convincing reasons to reject the opinion, it serves as a credible opinion on which the ALJ was entitled to rely.

Turning to Dr. Bernabe's status with SSA, Defendant has not disputed that Dr. Bernabe is no longer a consultative examiner for the SSA. State agencies, not the SSA, manage the hiring of consultative examiners and oversee that the examination reports comply with guidelines. *Reed v. Massanari*, 270 F.3d 838, 841-42 (9th Cir. 2001); 20 C.F.R. § 416.919s. The SSA does monitor the State agencies "management of the consultative examination process." 20 C.F.R. § 416.919t. If Dr. Bernabe was dismissed from the consultative examiner pool, it indicates that the State agencies or SSA were performing their duty of monitoring the consultative examination process. However, since Dr. Bernabe was still performing examinations at the time of Plaintiff's examination, he must not have been dismissed yet. As Dr. Bernabe was an acceptable consultative examiner at the time Plaintiff underwent the consultative examination, the ALJ did not have a legitimate reason to refuse to consider Dr. Bernabe's opinion. *See Reed v. Massanari*, 270 F.3d 838, 844 (9th Cir. 2001).

Whether the orthopedic consultative examiner was later fired by the SSA is irrelevant if the ALJ's reliance on his medical opinion is supported by substantial evidence in the record. Dr. Bernabe did not have any of Plaintiff's medical records to review and did not take any x-rays, but he did examine Plaintiff. He found she was morbidly obese. Plaintiff's height and weight are documented throughout the record and Plaintiff endorses this finding. Dr. Bernabe also found patellofemoral pain syndrome in both of Plaintiff's knees, which is supported by the imaging of Plaintiff's knees showing bilateral osteoarthritis. Dr. Bernabe's assessment that Plaintiff had range of motion in both knees from 0 to 130 degrees was based on his personal examination of her. (AR 138.) The ALJ properly addressed the other objective medical evidence not assessed by Dr. Bernabe by giving a detailed summary of it

and rejecting the allegations of the severity of resulting limitations because of Plaintiff's activities. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). Thus, the ALJ's findings regarding Plaintiff's physical impairments are supported by substantial evidence based on the record as a whole. *Id.*

The ALJ's RFC determination is based on his findings of Plaintiff's physical impairments. As his physical impairment findings are supported by substantial evidence, they also serve as substantial evidence of Plaintiff's RFC. *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012). The alleged severity of Plaintiff's lower extremity ailments was contradicted by her daily activities: she takes care of herself, does dishes which requires standing, and goes for walks. She also walked to two podiatry appointments shortly after foot surgery. Even if Plaintiff was required to walk to her podiatry appointments because of her personal circumstances, the fact she was able to indicates that if she needed to walk as a work requirement, she would be capable. The ALJ also found Plaintiff had full range of motion in her knees based on Dr. Bernabe's examination and that her pain was controlled with medication based on Dr. Pham's treatment notes which together suggest she would not be precluded from climbing ladders. Accordingly, the ALJ's determination of Plaintiff's physical RFC is supported by substantial evidence.

Finally, while Plaintiff claims the ALJ's opinion regarding Plaintiff's physical RFC is internally inconsistent, any error is harmless. Plaintiff identifies an inconsistency in the ALJ's opinion where he determines Plaintiff can perform medium work with some limitations but later states a light exertional capacity would be more appropriate than the medium exertional capacity opined by Dr. Bernabe. This sentence appears to be a typographical error. The ALJ adopted most of Dr. Bernabe's findings in his RFC determination and repeated almost the same limitations in his hypothetical to the VE. The testimony of the VE and the ALJ's findings based on the VE's testimony are not disputed. Aside from this one sentence saying a light exertional capacity would be more appropriate,

the rest of the ALJ's opinion and reasoning supports his physical RFC determination as discussed above. Thus, this typographical error is harmless.

## 2. Mental impairments

Plaintiff also argues her mental impairments are understated in the ALJ's RFC determination. (Joint Stip. at 5.) Plaintiff bases this argument on the fact the ALJ relied on the medical opinion of the consultative examiner and failed to provide significant and legitimate reasons before rejecting Plaintiff's treating psychiatrist's opinion. (Joint Stip. at 5-6.) Defendant argues that despite the fact that Plaintiff did not provide her treating psychiatrist's opinion until one month after the ALJ's decision, the ALJ's RFC determination is still consistent with the treating psychiatrist's opinion. (Joint Stip. at 8.)

If the Appeals Council "considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence." *Brewes v. Comm'r of SSA*, 682 F.3d 1157, 1163 (9th Cir. 2012); *accord Lingenfelter v. Astrue*, 504 F.3d 1028, 1030 n.2 (9th Cir. 2007). A contradicted treating physician's opinion received into evidence in the first instance by the Appeals Council must still be reviewed and can only be rejected under the specific and legitimate reasons standard. *Ramirez v. Shalala*, 8 F.3d 1449, 1453-54 (9th Cir. 1993).

Plaintiff's treating psychiatrist's medical opinion was not considered by the ALJ because it was submitted after he rendered his decision. The Appeals Council considered it but denied review and in doing so failed to list any reasons as to why the opinion should be rejected. This is analogous to *Ramirez* where the ALJ appeared to rely on a nonexamining physician's opinion regarding the plaintiff's mental diagnosis without discussing a treating physician's opinion and the treating physician's supplemental report was not discussed

18

because it was only submitted to the Appeals Council, which denied review without comment. *Ramirez,* 8 F.3d at 1453-5. The Ninth Circuit not only reversed the Secretary's decision but remanded for an immediate award of benefits. *Id.* at 1455. Indeed, in terms wholly pertinent here, the Ninth Circuit emphasized the ALJ's error in disregarding the treating physician's findings when "no testimony or other information in the record" contradicted the treating physician's findings regarding Ramirez's mental disorder. *Id.*

Here, Dr. Dittenmore, Plaintiff's treating physician, stated Plaintiff suffered from bipolar disorder and depression with psychosis. The ALJ found these specific impairments to be severe. (AR 17.) Dr. Dittenmore further stated that Plaintiff was precluded from most work-related activities for 15% or more of an eight-hour work day, had severe mood swings and anger outbursts, and cannot read, spell, or do math problems. None of these findings were expressly rejected by the ALJ by specific and legitimate reasons because the ALJ did not have Dr. Dittenmore's opinion at the time of the adverse decision. The ALJ found Plaintiff's mental health symptoms were controlled with medication, that she can read and write simple words, and that she was not responding to internal stimuli. These findings, even supplemented with Dr. Chehrazi's examining opinion, are nonetheless insufficient to refute Dr. Dittenmore's opined severe limitations because the ALJ was unaware of Dr. Dittenmore's opinion when he rendered his decision. Because he was unaware of the treating physician's opinion, he was unable to weigh it at all, let alone under the correct standard. Failure to reject Dr. Dittenmore's opinion under the appropriate standard was reversible legal error. *See Orn v. Astrue*, 495 F.3d 625, 632-33 (9th Cir. 2007). Moreover, even though the Dittenmore opinion was not available to the ALJ, it was available and part of the record before the Appeals Council, which also failed to consider the treating physician's opinion under the proper legal standard. *See Ramirez*, 8 F.3d at 1452 (noting that under 20 C.F.R. § 404.970(b), the Appeals Council is obligated to "evaluate the entire record, including new relevant evidence" submitted after the hearing before the ALJ).

When there is legal error and there are outstanding issues to be resolved, the district court should remand the case for further proceedings rather than for an award of benefits. *See Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015). In this case, the question of Plaintiff's mental health disability and the associated limiting effects could benefit from further administrative investigation and review. Thus, this issue is remanded to the agency for further determination.

## II.    The ALJ Erred in Discounting Plaintiff's Credibility Concerning the Severity of Her Mental Health Symptoms

Plaintiff contends the ALJ failed to provide legally sufficient reasons to reject Plaintiff's credibility concerning her physical and psychological symptoms and limitations. (Joint Stip. at 12.) The Court agrees in relation to her psychological symptoms.

### A. ALJ Credibility Determination and Related Facts

First, the ALJ found that Plaintiff's alleged symptoms could be caused by her medical conditions. (AR 20.) Next, the ALJ went through the objective findings as discussed above. Then, the ALJ found "[a]part from objective findings, there are substantial reasons … that [Plaintiff] remains able to engage in a wide range of work-related activities." (AR 25.) These reasons included her daily activities of light household chores, taking care of her personal needs, watching television, washing dishes, doing puzzles, and spending time with family and friends. (AR 25.) Her alleged foot pain that only allows her to walk one block or less he found discredited by her walking to podiatry appointments shortly after surgery. (AR 25.) The ALJ also found "the remainder of [Plaintiff's] treatment has been conservative in nature with no acute findings." (AR 25.) He discounted her mental limitations evidenced in one way through her special education classes by saying she "admitted that she can read and write basic words." (AR 25.)

At the ALJ hearing, the ALJ received a record of Plaintiff's special education classes into evidence.  (AR 407.)  Plaintiff's attorney and the ALJ discussed what the information meant:

ALJ: She had a low full-scale IQ score.  Is there anything showing -- do we have any records going back to before she was 22, showing such low scores?

ATTY: Your Honor, she does have a certificate from her high school that shows that she had lower standard proficiency in order to graduate.

…

ALJ: Eligible for differential standard of proficiency for graduation from Cajon (phonetic) High School.  What does that mean?

ATTY: Your Honor, I'm not sure.  I think it was just -- it must have been the testing is not the standard testing that's usually given.

ALJ: Okay.

ATTY: But I'm not sure back in the '80s what the standards were.

ALJ: I'm not either.

BY THE ADMINISTATIVE LAW JUDGE:

Q: So you were in -- it doesn't say -- were you in special education classes?

A: Yes.  I got into special ed when I was in 4th grade.

Q: Okay.  Why were you in special ed?

A: Because I couldn't read, I couldn't write, and I couldn't do math.

Q: Yet you got an A in English, you got an A in reading.

…

ALJ: These are basically report cards -- I want to just look up and see -- let's look up on the Internet and see what it says…  I imagine it just means they're going to give – let her have a lower standard.  And this is from Irvine.  Let's see what it says.  It just means there's different grounds other than taking a -- let's

21

1  see.  What it looks like is that, essentially, what it means is, like, if they have an

2  individualized education plan, if they meet those goals --

3  ATTY: Okay.

4  ALJ: -- then they'll be eligible to graduate as if – they would have -- they would

5  be able to graduate along with people who didn't have an IEP.  They just had to

6  meet the regular – there were different goals.

7  ATTY: Okay.  With a regular diploma?

8  ALJ: Yeah.  With a regular diploma and all the same advantages as somebody

9  who graduated with a regular diploma --

10  ATTY: Okay.

11  ALJ: -- or went to regular classes.  I don't really see a lot in here other -- you

12  know, that would make me think that she had a really low IQ score, though, that

13  I can say, yes, she had a low IQ score.

14  ATTY: Right.

15  ALJ: Okay.  If you had her IEP, that might have had it.

16

17  (AR 405-08.)

18

19     The ALJ further found in relation to Plaintiff's mental impairments that her psychiatric

20  medications have helped her.  (AR 25.)  He found Plaintiff's complaint of crying spells on

21  October 24, 2013 was explained by the fact she had been out of her medication for one week.

22  (AR 25.)  He found she only had mild depression after being out of medication for two

23  weeks.  (AR 25.)  However, he also identified an approximate one year span of time where

24  her medication did not help her.  (AR 24.)  The ALJ also stated that Plaintiff testified she was

25  not receiving mental health treatment, only medication.  (AR 25.)  Plaintiff's testimony,

26  however, included that she *had* been undergoing mental health treatment for about a year and

27  a half, that her doctor told her to try to do things around the house to avoid getting anxious,

28

and that her doctor was working on adjusting her medication to limit side effects. (AR 410, 415, 417.)

### B. **Applicable Law**

An ALJ must make two findings before determining that a claimant's pain or symptom testimony is not credible.[4] *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1102 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). "Second, if the claimant has produced that evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony regarding the severity of the claimant's symptoms" and those reasons must be supported by substantial evidence in the record. *Treichler*, 775 F.3d at 1102; *see also Marsh v. Colvin*, 792 F.3d 1170, 1174 n.2 (9th Cir. 2015); *Carmickle*, 533 F.3d at 1161 (court must determine "whether the ALJ's adverse credibility finding . . . is supported by substantial evidence under the clear-and-convincing standard").

In weighing a plaintiff's credibility, the ALJ may consider a number of factors, including: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other

---

[4]     Effective March 28, 2016, Social Security Ruling ("SSR") 16-3p superseded SSR 96-7p, which required the ALJ to assess the credibility of a claimant's statements. SSR 16-3p focuses on the existence of medical cause and an evaluation of "the consistency of the individual's statements about the intensity, persistence, or limiting effects of symptoms with the evidence of record without consideration of the claimant's overall 'character or truthfulness'." *See* Guide to SSA Changes in Regulations and Rulings 2016-17, June 2017. The revision is not applicable to Plaintiff's application here, which was filed on March 28, 2013. But the Ninth Circuit has acknowledged that SSR16-3p is consistent with existing precedent that requires that the assessments of an individual's testimony be focused on evaluating the "intensity and persistence of symptoms" after the ALJ has found that the individual has medically determinable impairments that could reasonably be expected to produce those symptoms. *Trevizo v. Berryhill*, 862 F.3d 987, 1000, n.5 (9th Cir. 2017).

testimony . . . that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). The ALJ must also "specifically identify the testimony [from the claimant that] she or he finds not to be credible and . . . explain what evidence undermines the testimony." *Treichler*, 775 F.3d at 1102 (quoting *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001)). "General findings are insufficient." *Brown-Hunter*, 806 F.3d at 493 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

C. **Analysis**

The ALJ found there was no medical evidence to support the allegation that Plaintiff suffered from seizures and asthma, so he did not need to reach the severity of the symptoms. *Treichler*, 775 F.3d at 1102. The ALJ gave Plaintiff's allegations of physical symptom severity relating to arthritis, thyroid disease, and hypertension little weight because the record revealed these symptoms were largely controlled with medication. Plaintiff received either no treatment or conservative treatment for the majority of her physical impairments. Plaintiff did undergo surgery on her foot, but then she walked to her podiatry appointments after the surgery. All of these reasons, based on substantial evidence in the record, support the ALJ's credibility finding relating to Plaintiff's allegations of the debilitating effects of her physical symptoms.

However, the ALJ did not properly evaluate Plaintiff's credibility regarding the disabling effect of her mental impairments. Plaintiff alleged she could not work because of a learning disability, emotional problems, and depression. The ALJ found Plaintiff had bipolar disorder, depression with psychosis, and that she was in special education classes, all of which served as objective medical findings that could produce her alleged symptoms, satisfying the first credibility test prong. *Treichler*, 775 F.3d at 1102. The ALJ then needed

to either find that Plaintiff malingered or provide clear and convincing reasons substantially supported by the record to reject her testimony regarding the severity of her mental symptoms. *Id.*

The reasons the ALJ provided for giving little weight to Plaintiff's credibility regarding her mental impairments were not clear and convincing reasons or supported by substantial evidence in the record. The ALJ's finding that Plaintiff testified she was not receiving mental health treatment is not supported by the hearing transcript because Plaintiff testified about the mental health treatment she was receiving from her doctor. (*See* AR 410.) The ALJ found Plaintiff's medications have helped her, which would undermine the severity of her symptoms, but the ALJ himself observed that there was an approximate one year span of time where her medication did not help her. This portion of the record remains unexplained and is contrary to the ALJ's finding that her mental impairments were adequately managed with medication. Indeed, at the hearing when asked directly whether the medications have helped with her mental health problems, Plaintiff testified, "They help a little but not very much though." (AR 414.) The ALJ's conclusion that her medication was helping her also appears contrary to her allegations that she started having and continued to have hallucinations. (*See* AR at 414 ("I just hear things or see things a lot.").) Further, the record indicates that Plaintiff had been prescribed a variety of strong medications for her depression, including Fluoxetine, Elavil, Celexa and Zoloft as well as psychotropic medications. (AR 23; 25; 150-152.)

The ALJ found there was no indication that Plaintiff responded to internal stimuli. This is not a clear and convincing reason to discredit Plaintiff's allegation of seeing and hearing hallucinations. Plaintiff did not claim she responded to her hallucinations, she claimed to see and hear them. Failure to respond to hallucinations is not proof that they do not occur. Plaintiff did not claim to be experiencing hallucinations on June 1, 2013 when she saw Dr. Chehrazi. When she saw Dr. Dittenmore on August 29, 2013, she did claim to be

experiencing visual hallucinations. On September 19, 2013 during an involuntary psychiatric hold evaluation, Plaintiff did not report hallucinations, but during the ALJ hearing on April 9, 2015, Plaintiff testified to experiencing auditory and visual hallucinations. In finding that Plaintiff's allegation of hallucinations was not credible the ALJ did not rely on this inconsistency. Indeed, the ALJ did not point to any record evidence that Plaintiff was untruthful, malingering, testified inconsistently, or failed to seek treatment, as a basis for discounting her credibility. The Court thus finds the ALJ wholly failed to provide legally sufficient reasons for discounting her credibility.

The ALJ also found that Plaintiff's alleged learning disabilities did not preclude her ability to work. The ALJ based his finding on the fact she graduated from high school and only received a few D grades, her testimony that she can read and write basic words, and the examining psychologist's medical opinion. (*See* AR 25.) However, the record also shows the ALJ was unsure how to evaluate Plaintiff's special education classes. (AR 406.) In examining Plaintiff's academic records that were presented at the hearing, the ALJ was unsure what was meant by a notation that Plaintiff was "Eligible for differential standard of proficiency for graduation from Cajon High School." (*Id.*) Plaintiff testified she had been in special education classes since fourth grade because she could not read, write, or do math, but the ALJ remarked, "Yet you got an A in English, you got an A in reading." (AR 407.)

There is an affirmative duty on the ALJ to develop the record if there is an ambiguity in the evidence. *Mayes*, 276 F.3d at 459-460. The ALJ did not know how to evaluate Plaintiff's special education classes, so he questioned Plaintiff as to what they meant. When Plaintiff was unable to give a sufficient explanation, the ALJ did an internet search. (AR 407-408.) The internet search did not provide very detailed information and based on the transcript, it is unclear if the search results were from the time period Plaintiff was in school. (*Id.* at 408.) The record is thus ambiguous as to how to assess Plaintiff's academic record and the ALJ erred in not developing the record further to resolve the ambiguity.

The ALJ has not provided clear and convincing reasons supported by substantial evidence to support his discounting of Plaintiff's subjective testimony regarding the severity of the symptoms of her mental health impairments. This is particularly true because the ALJ did not have the benefit of Plaintiff's treating psychiatrist's medical opinion.

Thus, the ALJ's determination regarding Plaintiff's mental health symptoms must be remanded to the agency for further administrative proceedings to adequately assess the opinions of Plaintiff's treating physician and to resolve remaining ambiguities in the record necessary to properly weigh Plaintiff's credibility as to the severity of her mental health symptoms. *See Dominguez*, 808 F.3d at 407-08.

## CONCLUSION

Accordingly, for the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED AND REMANDED for further administrative proceedings consistent with this Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and counsel for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATE: April 9, 2018

KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE